## FOR PUBLICATION



FILED

Apr 30 2013, 9:20 am

CLERK
of the supreme court,
court of appeals and
tax court

APPELLANT PRO SE:

**PHILLIP J. TROYER**
Fort Wayne, Indiana

ATTORNEY FOR APPELLEE:

**PERRY D. SHILTS**
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PHILLIP J. TROYER, | ) | |
| | ) | |
| Appellant/Cross-Appellee-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 02A03-1207-DR-319 |
| | ) | |
| TRACY L. TROYER, | ) | |
| | ) | |
| Appellee/Cross-Appellant-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Lori K. Morgan, Temporary Judge
The Honorable Thomas P. Boyer, Magistrate
Cause No. 02D07-1105-DR-365

**April 30, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Phillip J. Troyer ("Husband") and Tracy L. Troyer ("Wife") were married in 1993 and had one child, K.T., in 2000. In May 2010, Wife filed two petitions to dissolve the marriage, which were later dismissed. The parties' attempts at reconciliation were unsuccessful, and Wife filed a third petition in May 2011. In July 2011, the trial court entered a Provisional Order that awarded the parties joint legal custody and Wife primary physical custody of K.T. The Provisional Order also addressed issues such as child support and K.T.'s healthcare expenses. Between February and April of 2012, the trial court held four days of hearings on the dissolution petition. Husband filed a petition for attorney fees. In April 2012, the court issued a partial decree dissolving the marriage and holding the remaining issues under advisement. In June 2012, the trial court issued a Final Decree containing extensive findings of fact and conclusions thereon. In the Final Decree, the court valued the marital assets and divided them equally between the parties. The court also awarded the parties joint legal custody and Wife primary physical custody of K.T. Finally, the court denied Husband's petition for attorney fees.

Husband appealed, and Wife cross-appealed. Husband contends that the trial court abused its discretion in valuing and dividing the marital estate; exceeded its statutory authority in retroactively increasing his child support and healthcare expenses; abused its discretion in denying his petition for attorney fees; and failed to rule on two issues that he raised below. Wife contends that the trial court abused its discretion in awarding the parties

joint legal custody of K.T. She also asserts that Husband's appeal is frivolous or in bad faith such that she is entitled to attorney fees pursuant to Indiana Appellate Rule 66(E).

We conclude as follows: (1) the trial court did not abuse its discretion in valuing and dividing the marital estate; (2) the trial court exceeded its statutory authority in retroactively increasing Husband's child support and healthcare expenses; (3) the trial court did not abuse its discretion in denying Husband's petition for attorney fees; (4) the trial court did fail to rule on Husband's request for Wife to reimburse him for her share of K.T.'s private school expenses; (5) the trial court did not abuse its discretion in awarding the parties joint legal custody of K.T.; and (6) Husband's appeal is neither frivolous nor in bad faith, and therefore Wife is not entitled to attorney fees pursuant to Appellate Rule 66(E). Consequently, we affirm in part, reverse in part, and remand.

**Facts and Procedural History**

Husband and Wife were married in January 1993 and had one child, K.T., who was born in April 2000. On May 14, 2010, Wife filed a petition to dissolve the marriage, which she dismissed less than two weeks later. Wife filed a second petition for dissolution on May 27, 2010. The parties continued to live together until they sold their home in early July 2010, at which time Husband moved to an apartment. In December 2010, Wife asked Husband if the two could reconcile; as such, Wife dismissed her second petition on February 22, 2011.

The attempted reconciliation failed, and Wife filed a third petition for dissolution on May 3, 2011, which was deemed to be "the legal date of the parties' separation." Appellant's App. at 37. On July 15, 2011, the trial court entered a Provisional Order, which provided in

3

pertinent part as follows: (1) at K.T.'s request, Wife requested that Husband's parenting time with K.T. be limited, reduced, or restricted; however, there was no evidence that the exercise of Husband's parenting time would endanger the emotional or physical well-being of the child; (2) the trial court took judicial notice that Indiana caselaw prevents a child from dictating when, and in what fashion, a parent will exercise his or her parenting time; if the child has emotional issues that are interfering with parenting time, the solution is not to bow to the child, but instead to seek appropriate treatment for the child; (3) absent evidence to the contrary, there is an established presumption that each parent is a fit and proper person to have the care, custody, and control of K.T.; (4) the trial court recognized the sincerity of love and devotion by both parents toward K.T., and awarded joint legal custody; however, historical involvement with K.T. warranted Wife having primary physical custody and Husband exercising parenting rights under the Indiana Supreme Court's Parenting Time Guidelines; (5) by agreement of the parties, Wife was ordered to maintain health insurance for K.T., and Husband was ordered to pay $53 a week, effective May 3, 2011 (a $530 arrearage was to be satisfied with Husband making extra payments of $20 per week until the arrearage was paid); (6) each parent was responsible for his or her respective indebtedness incurred since the separation; and (7) each party was restrained from transferring, encumbering, concealing, selling, or otherwise disposing of joint marital property.

In September 2011, Husband asked Wife to reconcile, but Wife refused, stating that the marriage had run its course. In April 2012, the trial court entered its "Partial Decree and Dissolution of Marriage," which in pertinent part stated that the "marriage being irretrievably

4

broken, is hereby dissolved," that all other issues remain under advisement, and that "costs of this action are assessed to [Wife]." Appellant's App. at 37.

The Final Decree was fifteen pages long, identified eighty-three factual findings or legal conclusions, and was entered following the final hearing, which took the better part of four days and resulted in a transcript in excess of 800 pages. The Final Decree also: (1) identified K.T.'s circumstances and health history, including that K.T. suffered from anorexia nervosa and major depressive disorder; (2) identified the need for a Parenting Time Coordinator; (3) analyzed five years of Husband's income for child support purposes; (4) dealt with health insurance, uninsured healthcare expenses, and tax exemption issues; and (5) detailed the few agreements and the many disagreements of the parties, both prior to and during the dissolution process. The Final Decree identified stipulated values for various assets and then systematically resolved disputed property issues, including whether certain assets or debts should be included in the marital estate, whether dissipation under the statute had occurred from the actions of either party, and whether Wife's sale of her interest in her law practice eleven months prior to having filed the instant dissolution action was an arm's-length transaction. Ultimately, the trial court divided the marital estate equally and identified a balancing equalization judgment. Husband now appeals, and Wife cross-appeals. Additional facts will be included below.

## Discussion and Decision

After the final hearing, the trial court, on its own motion, entered findings of fact and conclusions thereon regarding the parties' dissolution proceedings. In reviewing an order in

5

which the trial court makes findings of fact and conclusions thereon, our standard of review is well-settled:

> First, we determine whether the evidence supports the findings and second, whether the findings support the judgment. In deference to the trial court's proximity to the issues, we disturb the judgment only where there is no evidence supporting the findings or the findings fail to support the judgment. We do not reweigh the evidence, but consider only the evidence favorable to the trial court's judgment. Challengers must establish that the trial court's findings are clearly erroneous. Findings are clearly erroneous when a review of the record leaves us firmly convinced a mistake has been made. However, while we defer substantially to findings of fact, we do not do so to conclusions of law. Additionally, a judgment is clearly erroneous under Indiana Trial Rule 52 if it relies on an incorrect legal standard. We evaluate questions of law de novo and owe no deference to a trial court's determination of such questions.

*Thalheimer v. Halum*, 973 N.E.2d 1145, 1149-50 (Ind. Ct. App. 2012) (quoting *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied* (2011)). On appeal, we "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A).

### *I. Valuation and Division of Marital Property*

Husband contends that the trial court abused its discretion in valuing and dividing the marital estate when it: (A) failed to include the value of Wife's ongoing law practice in the marital assets; (B) valued Wife's jewelry at $1000; and (C) concluded that Husband had not rebutted the presumption that an equal division of the marital property between the parties was just and reasonable. The decision regarding the valuation and division of marital property lies within the sound discretion of the trial court, and we will reverse only for an

6

abuse of that discretion. *Hartley v. Hartley*, 862 N.E.2d 274, 285 (Ind. Ct. App. 2007). We address each of Husband's issues in turn.

### A. Wife's Ongoing Law Practice

Husband first contends that the trial court "misconstrued both the facts of this case and applicable law" when it failed to attribute goodwill to Wife's "ongoing law practice as a marital asset or assign any value to it." Appellant's Br. at 15. Specifically, Husband maintains that Wife still retained goodwill in the law firm, Boeglin Troyer & Gerardot, P.C., and that the value of that goodwill should have been included in the marital assets.

Wife's "claimed one-half interest in Boeglin Troyer & Gerardot Sub S Corporation" was listed as Item 17.2 on the Joint Marital Balance Sheet. Appellant's App. at 92. Wife attributed no value to this asset. Husband, however, valued this asset as being worth $105,098. *Id*. at 93. Wife sold her shares in Boeglin Troyer & Gerardot, P.C. ("the Firm"), on June 29, 2010. *Id*. at 68. The Joint Marital Balance Sheet was completed as of May 3, 2011—eleven months after Wife sold her share of the Firm. In its Final Decree, the trial court made the following finding regarding this asset:

> 59. On or about June 29, 2010, [Wife] sold her fifty (50) shares of capital stock in Boeglin Troyer & Gerardot, P.C. to Jane M. Gerardot for Fifteen Thousand Three Hundred Eighty One Dollars and Twenty Five Cents ($15,381.25). This transaction took place approximately one (1) year prior to the filing of this case, and therefore the capital stock is not a marital asset.

*Id*. at 19. Thus the trial court did not abuse its discretion in finding that the capital stock of the Firm was not a marital asset.

On appeal, however, Husband contends that Wife retains enterprise goodwill in her ongoing law practice that should have been included in the marital assets. As background, we add the following facts. Husband and Wife are both attorneys. In June 1999, Husband became a partner in the Firm, which previously consisted of Wife and Jim Boeglin.[1] In 2000, Boeglin retired from the Firm, and pursuant to a stock purchase agreement, Husband and Wife purchased Boeglin's interest in the firm for $70,000. This price was based on Boeglin's goodwill contained in the extensive wills and trust files that he left with the Firm.

In the summer of 2002, Husband left the Firm to return to an in-house counsel position with an insurance company, and Jane Gerardot joined the Firm as a partner. Thereafter, Wife and Gerardot each owned fifty percent of the Firm. Wife and Gerardot entered into various agreements, including a stock purchase agreement ("Agreement I"), dated September 15, 2006. Under Agreement I, Wife and Gerardot agreed that, in the event one of the partners completely retired from the practice of law in Indiana and surrendered her client files to the Firm, the retiring partner would be entitled to receive a "Goodwill Reimbursement" based upon her "contribution toward the [F]irm's goodwill." *Id*. at 49. This provision provided as follows:

> *Goodwill Reimbursement*. It is understood and agreed that, in addition to the Sale Price, upon the occurrence of any Triggering Event other than death, *a departing Shareholder who is no longer engaged in the private practice of law in the State of Indiana and who leaves all of his or her client files, documents, and data with the firm*, shall be entitled to receive additional consideration

---

[1] Initially, the Firm was called Boeglin & Troyer, P.C. When Gerardot joined the Firm in 2002, the name was changed to Boeglin Troyer & Gerardot, P.C.

8

based upon his or her contribution toward the firm's goodwill ("hereinafter referred to as the "Goodwill Reimbursement").

*Id*. at 49 (emphasis added). Agreement I also included a formula for calculating the Goodwill Reimbursement. *Id*. at 50.

On June 29, 2010, Wife and Gerardot entered into a second stock purchase agreement ("Agreement II") that replaced Agreement I. *Id*. at 68. Under Agreement II, Gerardot paid Wife $15,381.25 for her fifty-percent share of the Firm's office contents, website domain, and cash reserve. Agreement II contained no provisions for the payment of Goodwill Reimbursement. Husband, however, contends that the value of the goodwill itself did not disappear. As such, Husband maintains that Wife retained goodwill in her client files that should have been considered an asset within the marital estate.

The trial court addressed the issue of goodwill reimbursement as follows:

> 68. The "Goodwill Reimbursement" clause of the September 15, 2006 Stock Purchase Agreement . . . was not applicable to the sale of [Wife]'s capital stock to Jane M. Gerardot. [Wife] continued to be **engaged in the private practice of law** as an employee of Boeglin Troyer & Gerardot, PC. As an employee of the law firm, [Wife] received fifty-four (54%) of the income from her **client files.**

*Id*. at 21. Although this finding was made in the context of whether Wife had dissipated the value of the marital assets, it also sheds light on the trial court's determination that Wife had no goodwill invested in the Firm that should have been included as part of the couple's marital assets.

In *Yoon v. Yoon*, 711 N.E.2d 1265 (Ind. 1999), our supreme court analyzed the issue of goodwill as follows:

9

Goodwill has been described as the value of a business or practice that exceeds the combined value of the net assets used in the business. Goodwill in a professional practice may be attributable to the business enterprise itself by virtue of its existing arrangements with suppliers, customers or others, and its anticipated future customer base due to factors attributable to the business. It may also be attributable to the individual owner's personal skill, training or reputation. This distinction is sometimes reflected in the use of the term "enterprise goodwill," as opposed to "personal goodwill."

Enterprise goodwill "is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers." Factors affecting this goodwill may include a business's location, its name recognition, its business reputation, or a variety of other factors depending on the business. Ultimately these factors must, in one way or another, contribute to the anticipated future profitability of the business. *Enterprise goodwill is an asset of the business and accordingly is property that is divisible in a dissolution to the extent that it inheres in the business, independent of any single individual's personal efforts and will outlast any person's involvement in the business.* It is not necessarily marketable in the sense that there is a ready and easily priced market for it, but it is in general transferrable to others and has a value to others.

. . . .

In contrast, the *goodwill that depends on the continued presence of a particular individual is a personal asset, and any value that attaches to a business as a result of this "personal goodwill" represents nothing more than the future earning capacity of the individual and is not divisible.* Professional goodwill as a divisible marital asset has received a variety of treatments in different jurisdictions, some distinguishing divisible enterprise goodwill from nondivisible personal goodwill and some not.

Indiana's dissolution law opts for recognition of this distinction. The General Assembly has determined that the "relative earning power" of the parties is not a divisible asset because it is not property, but may be considered in determining the percentage of property to be given to each. Accordingly, we join the states that exclude goodwill based on the personal attributes of the individual from the marital estate.

*Id*. at 1268-69 (emphasis added) (citations omitted).

10

Wife and Gerardot, as sole shareholders of the Firm, included in Agreement I a formula for placing value on goodwill. This value, however, applied only in the event that a shareholder: (1) left the Firm; (2) no longer engaged in the private practice of law in Indiana; and (3) left all of her client files, documents, and data with the Firm. Appellant's App. at 49. In such a case, the remaining partner would have been the sole beneficiary of "enterprise goodwill"—the intangible, but generally marketable, existence in the Firm of established relations with clients. *Yoon*, 711 N.E.2d at 1268.

In June 2010, by means of Agreement II, Gerardot purchased Wife's fifty-percent share of the Firm's office contents, website domain, and value of the Firm's cash reserves. Wife, however, retained her "personal goodwill," i.e., the interest in the Firm that depended on her continued presence in the practice of law. This was a personal asset that represented "nothing more than the future earning capacity of [Wife] and [was] not divisible."[2] *Id.* at 1269.

The trial court found that: (1) "goodwill reimbursement" did not apply to the sale of Wife's capital stock to Gerardot; (2) Wife continued to be engaged in the private practice of law as an employee of the Firm; and (3) as an employee, Wife received fifty-four percent of

---

[2] Husband contends that Wife could sell her client files at any time based on the expectation that the attorney who purchases the records could use them to solicit more business. While these files would presumably be valuable to an attorney who chose to purchase them, we are not convinced that the subsequent sale would reflect "enterprise goodwill." As the *Yoon* court explained, enterprise goodwill "is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers." 711 N.E.2d at 1268. Here, a future sale of Wife's client files will not convey to the buyer the long-term business relationships that Wife has forged with her clients or any of the other trappings that bring value to Wife's files.

the income from her own clients. Appellant's App. at 21. The trial court did not abuse its discretion in finding that Wife had no "enterprise goodwill" in the Firm that could be divisible as a marital asset.

## B. Valuation of Jewelry

During the dissolution proceedings, the parties disagreed on the valuation of the jewelry that Husband had given Wife during their marriage. Husband contends that the trial court abused its discretion in finding that Wife's jewelry was worth only $1000.

"The trial court has broad discretion in ascertaining the value of property in a dissolution action, and its valuation will only be disturbed for an abuse of that discretion." *Trabucco v. Trabucco*, 944 N.E.2d 544, 557-58 (Ind. Ct. App. 2011), *trans. denied*. Here, neither party offered receipts for the jewelry purchased or a professional appraisal of the value of Wife's jewelry. Instead, the parties provided the trial court with their own valuation of the jewelry. In the Joint Marital Balance Sheet, Wife valued the jewelry at $1000, while Husband valued it at $13,500. Appellant's App. at 92.

Wife was confident enough in her $1000 valuation that she was willing to let Husband have the jewelry for a $1000 setoff. Tr. at 319. Husband, by contrast, was willing to take the jewelry if it was valued at $1000 but would not take it if he would be charged a setoff of $2000. *Id*. at 716. Furthermore, Husband stated, "I don't know how much it's worth, it's in her possession." *Id*. When asked if he had ever asked to have the jewelry appraised, Husband answered, "Not in this case." *Id*. Husband agreed to let Wife have the jewelry only if he was credited with a set off of $13,000. *Id*. at 717. When asked whether the $13,000

12

was based upon his valuation, Husband responded that the estimate was "[j]ust a complete guess." *Id*. The trial court was within the bounds of the evidence presented and did not abuse its discretion in determining that Wife's jewelry was worth $1000 for purposes of dividing the marital estate.[3] *See Trabucco*, 944 N.E.2d at 558 (stating that trial court has broad discretion in determining value of property in dissolution action, and its valuation will not be disturbed absent abuse of discretion).

## C. Division of Marital Property

Husband contends that the trial court abused its discretion in finding that he failed to rebut the presumption of an equal distribution of the marital assets.[4] Specifically, Husband contends that the presumption was rebutted because Wife dissipated the marital estate by selling her shares of the Firm for only $15,381.25 and because Husband received an inheritance of $50,000, of which about $20,000 was held in his personal bank account when Wife filed her final petition for dissolution. Our standard of review is well settled:

> The division of marital assets lies within the sound discretion of the trial court, and we will reverse only for an abuse of discretion. When a party challenges

---

[3] During the final hearing, Wife admitted that Husband "may have spent $13,000.00 on Wife's jewelry." Tr. at 319. On appeal, Husband cites to this admission and urges us to "take judicial notice that prices for gold, diamonds, and other precious metals and stones have not depreciated in recent years." Appellant's Br. at 22. "Indiana Evidence Rule 201(f) provides that '[j]udicial notice may be taken at any stage of the proceeding,' which includes appeals." *Banks v. Banks*, 980 N.E.2d 423, 426 (Ind. Ct. App. 2012). However, we have held that "'judicial notice may not be used on appeal to fill evidentiary gaps in the trial record.'" *Id*. (quoting *Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 188 (Ind. Ct. App. 1998), *trans. denied*). Here, Husband essentially is asking us to fill the evidentiary gaps he created by failing to present this evidence, or request judicial notice, at trial. This we will not do.

[4] At the final hearing, Wife argued that Husband dissipated marital assets when he spent approximately $25,000 in an unsuccessful run for the U.S. Congress. The trial court found that Husband did not dissipate the marital assets because "[t]he expenditure was not excessive for a congressional campaign, and [Wife] was supportive of Husband's decision to run for Congress." Appellant's App. at 20. Wife does not appeal this issue.

13

the trial court's division of marital property, he must overcome a strong presumption that the court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. We may not reweigh the evidence or assess the credibility of the witnesses, and we will consider only the evidence most favorable to the trial court's disposition of the marital property. Although the facts and reasonable inferences might allow for a different conclusion, we will not substitute our judgment for that of the trial court.

*Galloway v. Galloway*, 855 N.E.2d 302, 304 (Ind. Ct. App. 2006) (citations omitted).

Indiana law presumes that an equal division of the marital property between the parties is just and reasonable; however, that presumption may be rebutted by relevant evidence that an equal division would not be just and reasonable. Ind. Code § 31-15-7-5. The factors a court may consider include: the contribution of each spouse to the acquisition of the property; the extent to which the property was acquired by each spouse before the marriage or through inheritance or gifts; the economic circumstances of each spouse at the time of disposition; the conduct of the parties as it relates to the disposition or dissipation of their property; and the earnings or earning ability of each spouse. *Id*. "If the trial court deviates from this presumption, it must state why it did so." *Galloway*, 855 N.E.2d at 305; *Thompson v. Thompson*, 811 N.E.2d 888, 912-13 (Ind. Ct. App. 2004), *trans. denied* (2005).

Husband contends, "if the record proved any of these factors were present during the marriage, it would have rebutted the initial presumption that an equal distribution of the marital estate was just and reasonable." Appellant's Br. at 23. We disagree. "Marital property includes property owned by either spouse prior to the marriage, acquired by either spouse after the marriage and prior to final separation, or acquired by their joint efforts."

14

*Swadner v. Swadner*, 897 N.E.2d 966, 977 (Ind. Ct. App. 2008). "The trial court's disposition of the marital estate is to be considered as a whole, not item by item." *Eye v. Eye*, 849 N.E.2d 698, 701 (Ind. Ct. App. 2006).

### *1. Dissipation of Marital Assets*

We have said,

> Fault is not relevant in dissolution proceedings except as related to the disposition or dissipation of marital assets. One spouse's claim of improvident spending by the other spouse can be a powerful weapon in an attempt to secure a larger share of the marital estate. However, a trial court presiding over a dissolution proceeding in which dissipation is an issue should not be required to perform an audit of expenditures made during the marriage in order to determine which spouse was the more prudent investor and spender.

*In re Marriage of Coyle*, 671 N.E.2d 938, 942 (Ind. Ct. App. 1996) (citations omitted).

Husband contends that the trial court abused its discretion in finding that Wife did not dissipate the marital assets. Specifically, Husband contends that Wife dissipated the value of her shares of the Firm. Husband contends that Wife's interest in the Firm was worth $105,098, but that Wife sold her interest during the pendency of the marriage dissolution for just $15,381.25. Appellant's App. at 93. Generally, our court reviews findings of dissipation under an abuse of discretion standard. *Goodman v. Goodman*, 754 N.E.2d 595, 598 (Ind. Ct. App. 2001). We will reverse only if the trial court's judgment is clearly against the logic and effect of the facts and the reasonable inferences to be drawn from those facts. *Id.*

"Waste and misuse are the hallmarks of dissipation. Our legislature intended that the term carry its common meaning denoting 'foolish' or 'aimless' spending. Dissipation has also been described as the frivolous, unjustified spending of marital assets which includes the

15

concealment and misuse of marital property." *Marriage of Coyle*, 671 N.E.2d at 943.

Factors to consider in determining whether dissipation has occurred include: (1) whether the expenditure benefited the marriage or was made for a purpose entirely unrelated to the marriage; (2) the timing of the transaction; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert the marital asset. *Goodman*, 754 N.E.2d at 598. Following the final hearing, the trial court made the following findings that are pertinent to this issue on appeal:

> 67. The sale of the capital stock by [Wife] to Jane M. Gerardot on June 29, 2010 for . . . $15,381.25 was an "arm[']s length transaction." Ms. Gerardot was willing to sell her interest in the law firm to [Wife] for the same amount.
>
> 68. The "Goodwill Reimbursement" clause of the September 15, 2006 Stock Purchase Agreement is not evidence of a dissipation of assets by [Wife]. This clause was not applicable to the sale of [Wife]'s capital stock to Jane M. Gerardot. [Wife] continued to be **engaged in the private practice of law** as an employee of [the Firm]. As an employee of the law firm, [Wife] received fifty-four percent (54%) of the income from her **client files.**

Appellant's App. at 21.

Wife sold her portion of the Firm to Gerardot in an "arm's length transaction," and did so almost a year before Husband placed a value on the Firm for purposes of inclusion in marital assets. *Id*. at 21. Gerardot testified that the price, in part, was based on independent appraisals of the Firm's personal property and said that she was willing to sell her interest in the law firm to Wife for the same amount that Wife sold it to her. Tr. at 221. Additionally, Wife did not have a buyback option or any other arrangement to return to the Firm as a

16

shareholder. *Id*. at 210-11. Wife knew that Gerardot was interested in retiring from the Firm in the near future. Wife also knew that when Gerardot retired and left her client files with the Firm, Wife would owe Gerardot a great deal of money under the terms of the "Goodwill Reimbursement" clause of Agreement I. Furthermore, if Gerardot retired prior to the settling of the marital estate, then the payment to Gerardot would have been a liability and could have been cited as marital debt. Wife's sale of her interest in the Firm prior to the settling of the marital estate was neither wasteful nor foolish, but instead an arm's-length business transaction that created certainty in the marital estate. The trial court did not abuse its discretion in finding that Wife did not dissipate marital assets.

## 2. *Husband's Inheritance*

Husband next contends that approximately $20,000 of his inheritance remained in his personal account on the date that Wife filed the instant petition for dissolution. As such, Husband argues that the trial court abused its discretion in determining that this personal bank account was marital property and that he had not rebutted the presumption that the marital property should be evenly divided.

Husband was left an inheritance of $50,000 by Grace and Ira Leer, a couple who treated Husband like a grandson. At the final hearing, the trial court learned the following about the inheritance. Husband testified that he had known about the inheritance since around 1995, two years after Husband and Wife married and almost sixteen years before they separated. In 1995, at the Leers' request, Wife drafted the trust document that provided for Husband's inheritance. Mrs. Leer died soon thereafter, and Mr. Leer died in late 2008.

17

Husband received the inheritance in the spring of 2009, and on July 3, 2009, deposited the whole amount into Husband and Wife's joint bank account ("joint account").

On July 8, 2009, Husband withdrew $5000 from the joint account and, at Wife's request, deposited that amount into K.T.'s college savings account. Four months later, on November 4, 2009, Husband withdrew $30,000 from the joint account and deposited that money into his personal bank account. With Wife's consent, Husband used $25,000 of that $30,000 as a contribution toward his own congressional campaign. On December 28, 2009, Husband withdrew an additional $15,000 from the joint account and deposited that money into his personal bank account. During the almost six months that Husband held some of his inheritance in the joint account, Husband and Wife deposited their respective salaries and paid their joint bills from that joint account. Although Wife filed various petitions for dissolution prior to filing the petition at issue, the couple did not officially separate until May 3, 2011, about two years after Husband received his inheritance.

In findings 55 through 78, the trial court specifically identified the assets and debts of the parties and the proposed distribution thereof consistent with the statutory presumption identified in Indiana Code Section 31-15-7-5. The parties had been married for eighteen years. Neither party claimed to have brought assets to the marriage. During their marriage, Husband and Wife were both practicing attorneys who made significant amounts of money. Husband spent $25,000 of his inheritance on a failed run for political office and deposited another $5000 into K.T.'s college fund. The remaining $20,000, which Husband received about two years before the Final Decree, was commingled in the joint account for six

18

months—an account into which the parties deposited their salaries and from which they paid their joint bills. Viewing the evidence as a whole, we cannot say that the trial court abused its discretion in finding that nothing in the record had rebutted the presumption that an equal distribution of the marital estate was appropriate.

## II. Retroactive Modification of Child Support and Healthcare Expenses

In its July 2011 Provisional Order, the trial court ordered Husband to pay $53 per week in child support and ordered Wife to maintain health insurance coverage for K.T. Wife did not petition to modify those provisions before the Final Decree was issued in June 2012. In finding 46 of the Final Decree, the trial court ordered Husband to pay $155 per week in child support, "with the first payment due and payable on January 6, 2012"—more than six months before the Final Decree was issued. Appellant's App. at 16. In finding 50, the trial court also ordered that as of January 1, 2012—again, more than six months before the Final Decree was issued—Wife was to be responsible for the payment of the first $1089

> of uninsured medical, dental, optical, pharmaceutical, orthodontia, **counseling and therapy** expense for [K.T.] each year, and thereafter, [Wife] shall be responsible for the payment of fifty-nine percent (59%) and [Husband] shall be responsible for the payment of forty-one percent (41%) of the aforesaid uninsured health care expenses for [K.T.] each year.

*Id*. at 17.

Husband argues that the trial court exceeded its statutory authority by ordering a retroactive increase in his child support obligation and contribution toward uninsured

19

healthcare expenses.[5] Husband contends that, because the Provisional Order addressed both child support and healthcare expenses, and Wife never petitioned to modify those expenses before the Final Decree, the trial court's authority in the Final Decree was limited to setting Husband's obligations as to those expenses from the date of the Final Decree and beyond. We agree.

Indiana Code Section 31-15-4-14 states, "A provisional order terminates when: (1) the final decree is entered subject to right of appeal; or (2) the petition for dissolution or legal separation is dismissed." Indiana Code Section 31-15-4-15 states, "The terms of a provisional order may be revoked or modified before the final decree on a showing of the facts appropriate to revocation or modification." It logically follows, then, that the terms of a provisional order may *not* be revoked or modified before the final decree *unless* such a showing is made. Here, the practical effect of findings 46 and 50 of the Final Decree was to modify the terms of the Provisional Order as to child support and healthcare expenses, even though Wife made no request for such, much less a showing of the facts appropriate to such modifications before the hearing on the Final Decree.[6] As such, we conclude that the trial court exceeded its statutory authority in ordering a retroactive increase of Husband's child

---

[5] We note that Husband does not claim that the trial court abused its discretion in calculating his child support obligation.

[6] We note that "court ordered modifications normally speak only prospectively." *Talarico v. Smithson*, 579 N.E.2d 671, 673 (Ind. Ct. App. 1991). "The modification of a support obligation may only relate back to the date the petition to modify was filed, and not an earlier date, subject to two exceptions not applicable here." *Becker v. Becker*, 902 N.E.2d 818, 820 (Ind. 2009). Again, Wife filed no petition to modify here.

support and healthcare expenses in the Final Decree. Therefore, we reverse and remand with instructions to amend the Final Decree accordingly.

### III. Husband's Attorney Fees

Husband also contends that the trial court abused its discretion in denying his petition for attorney fees. We review a trial court's decision on attorney fees in connection with a dissolution decree for an abuse of discretion. *Hartley*, 862 N.E.2d at 286.

Pursuant to Indiana Code Section 31-15-10-1, a trial court may order a party in a marriage dissolution proceeding to pay a reasonable amount of the attorney fees of the other party. "When making such an award, the court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income and other factors that bear on the reasonableness of the award." *Hendricks v. Hendricks*, 784 N.E.2d 1024, 1028 (Ind. Ct. App. 2003). "Consideration of these factors promotes the legislative purpose behind the award of attorney fees, which is to insure that a party in a dissolution proceeding, who would not otherwise be able to afford an attorney, is able to retain representation. *Hartley*, 862 N.E.2d at 286-87. "'When one party is in a superior position to pay fees over the other party, an award of attorney fees is proper.'" *Id*. at 287 (quoting *Ratliff v. Ratliff*, 804 N.E.2d 237, 249 (Ind. Ct. App. 2004)). Here, the trial court identified the parties' incomes as an aspect of its Final Decree—Husband's weekly gross income was $1715, and Wife's was $2510. Appellant's App. at 25. The trial court divided the marital estate equally. Because the parties' resources are relatively on par with each other, the only basis for an award of attorney fees would have been the improper actions

21

of one party necessitating the incurrence of attorney fees by the other party. *See Hendricks*, 784 N.E.2d at 1028 (stating that misconduct that directly results in additional litigation expenses may be properly taken into account in trial court's decision to award attorney fees).

Husband contends that Wife engaged in the following misconduct: (1) selling her fifty-percent share in the Firm in direct violation of a temporary restraining order; (2) cashing out her Scottrade IRA in the amount of $53,486; and (3) refusing to let Husband have any involvement in her "initial response to Anthem's coverage denial or her decision to issue a check for $46,200.00 to pre-pay for K.T.'s treatment."[7] Appellant's Br. at 37. As such, Husband argues that the trial court abused its discretion when it denied his request for attorney fees.

We disagree. First, the trial court found that Wife's sale of her interest in the Firm was an arm's-length business transaction, which occurred eleven months before the instant filing and did not result in dissipation of marital assets. Second, Husband was not affected by Wife cashing out the Scottrade IRA account because the parties agreed that the account was worth $53,486, and the trial court granted that asset to Wife as part of her share of the marital estate. Finally, the trial court ordered Wife to "provide health insurance for the parties' minor child through employment." Appellant's App. at 18. Wife was not engaging in misconduct when she dealt with her own health insurance company. The issues raised by

---

[7] Husband also cites to Wife's misconduct in claiming that she has a right to some of his inheritance when that claim "contradict[s] the expressed intent of her former clients," the Leers. Appellant's Br. at 37-38. In light of our finding that the inheritance was properly deemed to be a divisible marital asset, we find this argument unpersuasive.

Husband are not examples of Wife engaging in misconduct. The trial court did not abuse its discretion when it denied Husband's petition for attorney fees.

### *IV. Issues Without Trial Court Ruling*

Finally, Husband contends that the trial court failed to rule upon two issues. First, he claims that the trial court erred when it did not order Wife to reimburse him for her share of K.T.'s private school expenses—an obligation that was included in the Provisional Order. The Provisional Order provided in pertinent part as follows:

> 12.    …. The parties are ordered to continue sharing equal responsibility for payment of their child's attendance at [the private school], the same to include tuition, books, fees, extra-curricular activities, and other reasonable and related school expenses.

*Id*. at 42-43. Wife admits that the trial court did not address Husband's request in its Final Decree. Appellee's Br. at 28.

"The duration of provisional support orders is committed to the sound discretion of the trial court." *Moore v. Moore*, 695 N.E.2d 1004, 1009 (Ind. Ct. App. 1998). However, there is no indication in the record that the trial court in this instance intended anything other than that its Provisional Order should terminate upon entry of the final decree. As such, we remand to the trial court so that it may amend its Final Decree to include an order directing Wife to pay Husband that amount, which, together with her prior payments, results in the parties having shared "equal responsibility" for the payment of K.T.'s private school.

Second, Husband contends that the trial court did not address two healthcare issues: whether Husband should be allowed to intervene in Wife's appeal of Anthem's denial of

23

coverage for residential treatment of K.T.'s eating disorder; and the allocation between Husband and Wife of any non-reimbursed healthcare expenses. As to Husband's first concern, the Anthem coverage belonged to Wife. Wife testified that she intended to process the administrative appeal of the Anthem denial and to hire an attorney to pursue the claim. Because Husband did not have a right to pursue the claim, the trial court did not abuse its discretion in failing to rule on this issue, which left the administrative appeal in the hands of Wife. Because Wife is responsible for the first $1089 of annual uninsured health care and for 59.4% of all uninsured expenses that rise about that amount, Wife has as much incentive as Husband, if not more, to successfully appeal the Anthem denial.

Husband also contends that, notwithstanding extensive arguments on the issue, the trial court failed to rule on each party's obligation regarding the healthcare expenses that Anthem denied. We find that the trial court adequately addressed the payment of these expenses in finding 50 of the Final Decree, which is quoted in section II of this opinion, as well as in the following finding:

> 80. The order entered at Paragraph 50 herein includes [K.T.]'s treatment at the Eating Recovery Center and travel expenses (airline and lodging) for [K.T., Wife, and Husband] with respect to K.T.'s treatment. As noted at Paragraph 50, this is a family problem and requires a family resolution. The attendance and participation by [Wife] and [Husband] at the Eating Recovery Center along with the education and information provided to [Wife] and [Husband] are important components to [K.T.]'s recovery.

Appellant's App. at 23-24.

24

## V. Joint Legal Custody

On cross-appeal, Wife asserts that the trial court erred in awarding the parties joint legal custody of K.T. "'Joint legal custody' … means that the persons awarded joint custody will share authority and responsibility for the major decisions concerning the child's upbringing, including the child's education, health care, and religious training." Ind. Code § 31-9-2-67. "In an initial custody determination there is no presumption favoring either parent." *Gonzalez v. Gonzalez*, 893 N.E.2d 333, 335 (Ind. Ct. App. 2008) (citing Ind. Code § 31-17-2-8).

> The court may award legal custody of a child jointly if the court finds that an award of joint legal custody would be in the best interest of the child. Ind. Code § 31-17-2-13. *And an award of joint legal custody does not require an equal division of physical custody of the child.* Ind. Code § 31-17-2-14.

*Id.* (emphasis added).

Child custody determinations fall squarely within the discretion of the dissolution court and will not be disturbed except for an abuse of discretion. *Blasius v. Wilhoff*, 863 N.E.2d 1223, 1229 (Ind. Ct. App. 2007), *trans. denied*. "The trial court is in a position to see the parties, observe their conduct and demeanor, and hear their testimony; therefore, its decision receives considerable deference in an appellate court." *Trost-Steffen v. Steffen*, 772 N.E.2d 500, 509 (Ind. Ct. App. 2002), *trans. denied*. We will not reverse the trial court's decision unless it is against the logic and effect of the facts and circumstances before it or the reasonable inferences drawn therefrom. *Id.* "On review, we will not reweigh evidence,

judge the credibility of the witnesses, or substitute our judgment for that of the trial court."

*Farag v. DeLawter*, 743 N.E.2d 366, 368 (Ind. Ct. App. 2001).

Indiana Code Section 31-17-2-15 addresses the matters a court must consider in determining whether to award the parties joint legal custody:

> In determining whether an award of joint legal custody … would be in the best interest of the child, the court shall consider it a matter of primary, but not determinative, importance that the persons awarded joint custody have agreed to an award of joint legal custody. The court shall also consider:
>
> (1) the fitness and suitability of each of the persons awarded joint custody;
> (2) whether the persons awarded joint custody are willing and able to communicate and cooperate in advancing the child's welfare;
> (3) the wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age;
> (4) whether the child has established a close and beneficial relationship with both of the persons awarded joint custody;
> (5) whether the persons awarded joint custody:
>     (A) live in close proximity to each other; and
>     (B) plan to continue to do so; and
> (6) the nature of the physical and emotional environment in the home of each of the persons awarded joint custody.

"Therefore, trial courts must consider 'whether the parents have the ability to work together for the best interests of their children.'" *Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (quoting *Arms v. Arms*, 803 N.E.2d 1201, 1210 (Ind. Ct. App. 2004)).

After presiding over a four-day hearing, which was transcribed in an eight-hundred-eleven-page transcript, the trial court made the following pertinent findings:

> 5.    [K.T.] received treatment at the Eating Recovery Center … from January 18, 2012 to March 21, 2012.

26

6.  [K.T.] suffers from anorexia nervosa and major depressive disorder (Exhibit 38).

7.  [K.T.] has been involved in counseling since age seven (7) for behavioral issues.

8.  [K.T.] has been diagnosed in the past with oppositional defiance disorder. It has also been suggested that [K.T.] may have some form of sensory integration disorder (Exhibit L).

9.  [K.T.]'s behaviors include violent outbursts and tantrums, panic attacks, self-mutilation, binging and purging.

10. [K.T.]'s violent outbursts include attempts to assault [Wife] and [Husband]. There have been no reports that [K.T.] has attempted to assault anyone other than her parents.

11. [K.T.] is an intelligent child, but [K.T.]'s intelligence does not necessarily correlate with rational thinking and emotional maturity.

12. The divorce process for [Wife] and [Husband] began in May of 2010, and has taken a toll on [Wife], [Husband], and [K.T.].

13. [Wife] and [Husband] have different parenting styles. [Wife] tends to be lenient and [Husband] tends to be a disciplinarian. [K.T.] needs structure and consistency from her parents.

14. There have been times when [Wife] and [Husband] have been able to cooperate and work together for the benefit of [K.T.]. Examples include cooperation and assistance following [Wife]'s automobile accident, the selection of Brooke Farrington as a therapist for [K.T.], the selection of the Eating Recovery Center for [K.T.]'s treatment, and agreement by [Wife] and [Husband] regarding extra-curricular activities for [K.T.].

15. There have been times when [Wife] and [Husband] have not cooperated and communicated effectively for the benefit of [K.T.] (Exhibits 5, 7, 8, 13, 25, 26, G, H and R).

27

16. [Wife] has provided [K.T.] with too much information regarding the parties' divorce and allowing [sic] [K.T.] to have too much involvement (Exhibit 18).

17. [Husband's] communication with [K.T.] regarding parenting time and her cat have caused [K.T.] emotional distress (Exhibits 7, 10, 11, 13 and 39).

18. The entire process of her parents' divorce has been very stressful for [K.T.], and stress is frequently a trigger for someone with an eating disorder.

19. [Wife] and [Husband] both love [K.T.] and want what is best for her. Unfortunately, for a multitude of reasons, [Wife] and [Husband] have not always acted in [K.T.]'s best interest, individually and collectively.

20. [K.T.] is twelve (12) years old and [Wife] and [Husband] will be parenting [K.T.] for many more years. [K.T.]'s physical and mental health issues are very serious and potentially life threatening.

21. Granting [Wife] or [Husband] sole legal custody of [K.T.] is not in her best interest. What is in [K.T.]'s best interest is two (2) parents working together in a consistent and unified manner. This requires a sharing of information and joint decisions regarding [K.T.]'s care, treatment and overall upbringing.

22. Despite their differences, [Wife] and [Husband] share a common goal of helping [K.T.] mature and grow into a functioning, happy, and responsible person.

23. [Wife] and [Husband] are granted joint legal custody of [K.T.].

24. [Wife] is granted primary physical custody of [K.T.].

25. At this time parenting time between [Husband] and [K.T.] will endanger her physical health or significantly impair her emotional development.

26. [Husband] has acknowledged that parenting time with [K.T.] is not in her best interest at this time. [Husband] is prepared and willing to work

28

with mental health professionals to facilitate parenting time and his relationship with [K.T.].

27. [Husband] is granted parenting time with [K.T.] consistent with the recommendations of her treating therapists and psychiatrist. [Wife] is ordered to be cooperative and supportive of [Husband]'s parenting time with [K.T.].

28. Either party may request a Status Hearing regarding parenting time.

29. The Court has seriously considered ordering [Wife] and [Husband] to participate in classes for high conflict parents at Family Connections or Right Relations. The Court has also given serious consideration to ordering [Wife] and [Husband] to participate in individual and joint counseling along with therapeutic parenting time for [Husband] and [K.T.].

30. [Wife] and [Husband] need support, assistance and guidance in their co-parenting of [K.T.].

31. The Court finds that it is necessary and appropriate to appoint a Parenting Coordinator to provide support, assistance, and guidance for [Wife] and [Husband] in co-parenting [K.T.]. The Court further finds that the appointment of a Parenting Coordinator is in [K.T.]'s best interest. *In Re: the Paternity of C.H.*, 936 N.E.2d 1270 (Ind. App. 2010)[, *trans. denied* (2011)].

Appellant's App. at 11-18.

Notably, Wife does not challenge the factual correctness of any of the trial court's findings. Rather, she contends that they militate toward the conclusion that she should be awarded sole legal custody of K.T. We have said that

> [o]rders of joint custody will not be reversed unless the court is attempting to impose an intolerable situation upon the parties. If the parties demonstrate a willingness and ability to communicate concerning the child, then joint custody is appropriate even against the wishes of one parent. However, if the parties have made child-rearing a battleground, then joint custody is not appropriate.

29

*Periquet-Febres v. Febres*, 659 N.E.2d 602, 605 (Ind. Ct. App. 1995) (citations omitted), *trans. denied* (1996).

Although Husband and Wife's relationship is currently strained and K.T.'s psychological condition is currently precarious, we do not believe that the trial court is attempting to impose an "intolerable situation upon the parties" in awarding joint legal custody here. The trial court found that Husband and Wife have occasionally been able to cooperate for K.T.'s benefit, such as in making joint decisions regarding K.T.'s therapy and treatment and extracurricular activities. Moreover, Husband asserts, and Wife does not dispute, that he had never "unreasonably refused to consent to: 1) a health care provider for their daughter; 2) a change in her schooling; or 3) change in her religious upbringing." Appellant's Reply Br. at 34. Some of these decisions may have been reached only after tense exchanges or extended negotiations between the parties, but such may be the case even in intact family situations. Wife highlights the areas and instances of conflict between the parties, but the fact remains that the trial court had some evidentiary basis for concluding that they could cooperate in making major decisions concerning K.T.'s upbringing, such that awarding joint legal custody would be in her best interest.

Wife also emphasizes that she currently has primary physical custody of K.T. and that the trial court found that parenting time between Husband and K.T. "will endanger her health or significantly impair her emotional development." We note, however, that Husband has acknowledged this and that the trial court has prescribed certain measures for monitoring and

remedying this situation, which may ultimately lead to Husband's reconciliation with K.T.[8]

Also, we reiterate that an award of joint legal custody does not require an equal division of physical custody. Ind. Code § 31-17-2-14. Wife does not challenge the trial court's finding that she and Husband "share a common goal of helping [K.T.] mature and grow into a functioning, happy, and responsible person." The trial court was in the best position to assess whether awarding the parties joint legal custody is in K.T.'s best interest, and we will not second-guess that determination on appeal.

## VI. Wife's Attorney Fees

Finally, Wife contends that the "complete absence of merit to each and every aspect of [Husband's] appellate effort" warrants the assessment of appellate attorney fees pursuant to Indiana Appellate Rule 66(E).[9]  Appellee's Br. at 40.

> Indiana Appellate Rule 66(E) provides, in pertinent part, "[t]he Court may assess damages if an appeal … is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorney fees." Our discretion to award attorney fees under Indiana Appellate Rule 66(E) is limited, however, to instances when an appeal is permeated with meritlessness, bad faith, frivolity, harassment, vexatiousness, or purpose of delay. Additionally, while Indiana Appellate Rule 66(E) provides this Court with discretionary authority to award damages on appeal, we must use extreme restraint when exercising this power because of the potential chilling effect upon the exercise of the right to appeal.

---

[8] Wife does not dispute the trial court's finding that she provided K.T. with too much information regarding the divorce and allowed her to have too much involvement. We remind Wife that "[a] parent may not sow seeds of discord and reap improved custody rights." *Pierce v. Pierce*, 620 N.E.2d 726, 731 (Ind. Ct. App. 1993), *trans. denied* (1994).

[9] In the alternative, Wife asks us to remand this issue to the trial court for an award of appellate attorney fees under Indiana Code Section 31-15-10-1. Following the same reasoning used in section III above to deny Husband's request for attorney fees, we deny Wife's request for attorney fees pursuant to Indiana Code Section 31-15-10-1.

*Thacker v. Wentzel*, 797 N.E.2d 342, 346 (Ind. Ct. App. 2003) (citations omitted). "A strong showing is required to justify an award of appellate damages and the sanction is not imposed to punish mere lack of merit but something more egregious." *Ballaban v. Bloomington Jewish Cmty., Inc.*, 982 N.E.2d 329, 340 (Ind. Ct. App. 2013).

Wife contends that Husband's pro se appeal required that she either represent herself or retain counsel and incur attorney fees. Wife also contends that Husband has failed to identify any legal support for his contentions, has repeatedly asked this court to reweigh the evidence, and has shown complete disregard for the trial court's specific findings on the relevant issues as well as the testimony from the final hearings as a whole. Appellee's Br. at 40. Contrary to Wife's assertion, Husband has provided ample legal support for his arguments and in fact has prevailed on two of them. Husband's remaining arguments may lack legal merit, but we cannot say that they are frivolous or made in bad faith. Accordingly, we deny Wife's request for attorney fees.

### *Conclusion*

We reverse the trial court's retroactive modification of Husband's child support and healthcare expenses and remand with instructions to amend the Final Decree accordingly. On remand, the trial court shall also amend the Final Decree to include an order directing Wife to reimburse Husband for her share of K.T.'s private school expenses pursuant to the Provisional Order. In all other respects, we affirm the trial court.

Affirmed in part, reversed in part, and remanded.

BROWN, J., concurs.

KIRSCH, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

PHILLIP J. TROYER,                                )
                                                 )
    Appellant/Cross-Appellee-Respondent,     )
                                                 )
          vs.                                )    No. 02A03-1207-DR-319
                                                 )
TRACY L. TROYER,                                 )
                                                 )
    Appellee/Cross-Appellant-Petitioner.     )

**KIRSCH, Judge,** *concurring in part and dissenting in part.*

I concur with my colleagues in Parts I, II, III, IV, and VI of the majority opinion. I respectfully dissent, however, from Part V regarding the order for joint custody.

The trial court, here, was correct that the best interest of K.T. would be served by "two parents working together in a consistent and unified manner." *Appellant's App*. at 13. Indeed, a similar statement could be made in every marital dissolution case involving children. There is nothing in the record before us, however, that reveals that the trial court's statement was supported by the evidence or was a realistic expectation. Rather, the record repeatedly demonstrates that these parents cannot currently work together in such a manner.

Putting a child in jeopardy based only on the hope that her parents can work together is not in the child's best interest and, indeed, could lead to significant harm.

34

Here, the trial court: determined, and Husband agreed, that no parenting time should be currently allocated to Husband because that would "endanger" K.T.'s physical health or significantly impair her emotional development; "seriously considered" ordering parents to participate in classes for "high conflict parents" and in individual and joint counseling; considered therapeutic parenting time; and appointed a Parenting Coordinator to provide support, assistance, and guidance. Given these very real and very serious concerns, it was error to order joint custody.

Moreover, following the dissolution, Husband filed a grievance with the Indiana Supreme Court Disciplinary Commission against Wife ensuring that the adversarial nature of his relationship with the Wife will be continued.

Appellate courts are reluctant to reverse a trial court's grant of joint legal custody. We will do so, however, when "'the joint custody award constitutes an imposition of an intolerable situation upon two persons who have made child rearing a battleground.'" *Swadner v. Swadner*, 897 N.E.2d 966, 974 (Ind. Ct. App. 2008) (quoting *Aylward v. Aylward*, 592 N.E.2d 1247, 1251 (Ind. Ct. App. 1992)). Nothing in the record before us and none of the trial court's findings support the conclusion that, *at the present time,* these two parents can work together in a consistent and unified manner. I would reverse the trial court's decision to grant parents joint legal custody, and I respectfully dissent from Part V of the majority opinion.